# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### No. 1:25-cv-391

| | |
|---|---|
| JOSHUA STOW, SHARONE BUNN, AND TIARA LOFTON, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>ACTIVEHOURS, INC. d/b/a EARNIN,<br><br>     Defendant. | **CLASS ACTION COMPLAINT** |

Plaintiffs Joshua Stow, Sharone Bunn, and Tiara Lofton ("Plaintiffs"), individually and on behalf of the class defined below, bring this action against Activehours, Inc. ("Defendant" or "EarnIn"), and allege as follows:

## I.    NATURE OF THE ACTION

1.    Payday loans, which are also called "cash advances," are small, short-term cash loans provided by a lender to a consumer, who, in exchange, provides the lender with access to their future earnings—such as by providing a check held for future deposit or electronic access to their bank account.[1]

2.    The North Carolina Consumer Finance Act ("CFA") strictly regulates the lending of small-dollar loans. Among other things, the law sets strict interest rate caps on

---

[1] *Payday Loans*, N.C. Att'y Gen., https://ncdoj.gov/protecting-consumers/credit-and-debt/payday-loans/.

such loans and requires all lenders who issue such loans to first obtain a license from the North Carolina Commissioner of Banks. *See* N.C.G.S. § 53-164, *et seq.*

3.     Moreover, the CFA categorically prohibits lenders from taking an assignment of earnings from consumers as security for the payment of the loan—that is, the practice of payday lending—and provides that such assignments are void and unenforceable. N.C.G.S. § 53-180(b) provides:

> **No Assignment of Earnings.** A licensee shall not take an assignment of earnings of the borrower for payment or as security for payment of a loan. An assignment of earnings in violation of this section is unenforceable. A sale of unpaid earnings made in consideration of the payment of money to or for the account of the seller of the earnings is deemed to be a loan to the seller by an assignment of earnings.

4.     For years, Defendant has flouted North Carolina law by selling cash advances to North Carolina consumers through its online mobile application, "EarnIn." In violation of North Carolina law, Defendant sells cash advances to North Carolina consumers without the requisite license, repeatedly taking the assignment of consumer earnings as consideration for each cash advance and collecting on unenforceable cash advance agreements.

5.     Accordingly, Plaintiffs bring this action, on behalf themselves and the class of North Carolina consumers defined below, under the North Carolina Unfair and Deceptive Practices Act ("UDPA"), North Carolina Consumer Finance Act ("CFA"), and North Carolina Debt Collection Act ("DCA"), and seek to enjoin Defendant's unlawful trade practices and recover all damages authorized by law.

2

## II.   **JURISDICTION AND VENUE**

6.     The Court has subject matter jurisdiction in this class action diversity case under 28 U.S.C. § 1332(d) because (1) this action is a class action; (2) the amount in controversy exceeds $5 million, and (3) at least one member of the class is a citizen of a state different from Defendant.

7.     The Court has personal jurisdiction over Defendant because Defendant sold and provided its services to Plaintiffs in this state. Defendant also does substantial business in this state with other customers.

8.     Venue is proper under 28 U.S.C. § 1391(b) in that the Defendant does business in this district and a substantial part of the events giving rise to the claims at issue occurred here.

## III.   **PARTIES**

9.     Joshua Stow is a person who resides in Yadkinville, North Carolina. Plaintiff Stow has purchased multiple cash advances from Defendant.

10.     Sharone Bunn is a person who presently resides in Washington, D.C. Plaintiff Bunn previously resided in Rocky Mount, North Carolina, where she purchased multiple cash advances from Defendant.

11.     Tiara Lofton is a person who resides in Winterville, North Carolina. Plaintiff Lofton has purchased multiple cash advances from Defendant.

12.     Defendant is a technology company incorporated in Delaware and having its principal place of business in Palo Alto, California.

## IV.    FACTUAL ALLEGATIONS

### A.    Defendant offers a cash advance product to North Carolina consumers.

13.    Defendant offers a cash advance product to North Carolina consumers over the internet.

14.    Defendant offers this product through a lending app called "EarnIn."

15.    The app provides up to $100 in cash advances at a time, and up to $750 per pay period.

16.    Defendant advertises its cash advance product as a way for consumers to access their earned wages before payday.

17.    The advertised and intended purpose of EarnIn's cash advance product is to provide an instant source of money directly from a cell phone, that consumers can use to pay time-sensitive obligations or cover surprise expenses.

18.    For example, EarnIn prominently advertises that its product makes money available "within minutes":



Case 1:25-cv-00391     Document 1     Filed 05/19/25     Page 4 of 27

19.     Similarly, EarnIn claims that its product can be used to "cover surprise expenses" because the product provides "instant access" to money.



20.     EarnIn further describes its product as providing daily access to money, allowing consumers to obtain cash "right when [they] need it."



21.     EarnIn's video advertisements further this narrative: they show people in situations where they need immediate cash—filling empty gas tanks and covering unexpected expenses—and they advertise the EarnIn app as providing a solution to such needs. *See* https://www.youtube.com/watch?v=nTm8iKvAZ04.

22.     Plaintiffs signed up for EarnIn's app, obtained EarnIn's cash advance product, and used it for personal, family, and/or household purposes.

**B.     EarnIn structured its cash advance product to ensure consumers pay money to obtain the product.**

23.     EarnIn's goal in offering its cash advance product is to obtain compensation from consumers for lending money.

24.     EarnIn achieves this goal through charges that are labeled as "lightning speed fees" and "tips."

25.     Although these amounts are purportedly "voluntary," EarnIn has structured its cash advance product to ensure that users pay these charges on the vast majority of transactions.

26.     For example, the lightning speed fee is not a voluntarily-paid fee. It is a mandatory fee a consumer must pay in order to obtain a specific product sold by Earnin— an immediate cash advance.

27.     The lightning speed fee ranges in amounts of $1.99 to $5.99, depending on the amount of cash borrowed.[2]

28.     If users do not pay this charge, they cannot obtain the advertised version of EarnIn's cash advance product, or use the product for its intended purpose.

---

[2]     https://help.earnin.com/hc/en-us/articles/4407090975635-Lightning-Speed-fees-and-details.

29.     Instead, they obtain an inferior version of EarnIn's product, which provides access to cash days after a request is made, and which cannot be used to pay time sensitive obligations or cover surprise expenses.

30.     EarnIn's lightning speed fee does not actually cover the cost of providing a service, as it costs little to nothing to offer advances immediately; instead, this charge is imposed to obtain compensation for lending money.[3]

31.     Regarding EarnIn's "tip" charge, EarnIn uses a host of deceptive tactics to pressure and confuse its users into agreeing to pay this charge.

32.     Indeed, the use of the word "tip" to describe this charge is deceptive in its own right because this charge does not go to delivery drivers, hourly workers, or employees trying to make ends meet; rather, this charge, like the lightning speed fee, is a revenue source for EarnIn. The use of the word "tip" is thus likely to mislead consumers, as it both exploits and contravenes reasonable consumers' expectations that "tips" are amounts paid to actual workers—not an additional source of revenue for a business.

33.     In addition to deceptively labeling this charge as a "tip," EarnIn employs a host of deceptive tactics to mislead users to believe that this is a mandatory charge, or to make paying this charge difficult to avoid.

_____

[3] Before 2022, EarnIn did not charge users to obtain the advertised version of its product, and users could obtain cash advances immediately, and use them for their advertised and intended purpose without paying an additional charge. Clearly, EarnIn instituted the lightning speed fee to force its users to pay money on virtually every loan transaction.

34.     For example, previously, when requesting tips, EarnIn's app suggested that the tip was a mandatory charge, claiming that some other customer had paid the cost of the service for the user, and therefore requested the user to pay a tip in order to "pay it forward" to someone else.



35.     EarnIn employs a similarly deceptive tactic today, representing that users must pay tips to "keep[] us running," and by presenting consumers with four, non-zero tipping options of $6, $8, $11, and $13.



36. By presenting consumers with non-zero tip options of $6, $8, $11, and $13, EarnIn suggests consumers have the option to pick one of the default amounts, but do not otherwise have the option to avoid tipping.

37. And even for those that manage to see past this deceptive presentation, EarnIn still makes it difficult to avoid paying a tip.

38. To do so, consumers must click the pencil button on the above-shown tip screen, after which they are taken to another screen that defaults to an $11 tip, representing that tips "keep us running for members like you."



39.     When a consumer changes the default tip to $0, they are taken back to the original tip screen, and they are asked to confirm that they wish to forgo paying a tip and forgo helping to "support EarnIn."



40.     In order to avoid paying a tip, users must go through this exhausting and confusing hurdle, and often times do not even understand how to navigate the app to avoid doing so.

41.     EarnIn has used other deceptive strategies as well, including representing that tips "help" people,[4] "support the service," and "keep EarnIn running for the rest of the community," while presenting users with a default tip to pay.

42.     EarnIn's deceptive strategy to solicit its "tip" charge works, as most users pay this charge, despite the vast majority being in desperate need of cash.

43.     For example, a 2023 study by a California regulator found that cash advance apps that solicit tip-like charges receive them on 73% of loan transactions. *See* Exhibit A, pp. 1, 7.

44.     A 2024 survey by a Maryland non-profit organization similarly found that 73% of respondents paid tip-like charges. *See* Exhibit B, p. 4.

45.     The structure of EarnIn's cash advance product has been successful at ensuring that EarnIn's users pay money to receive advances, as EarnIn's cash advance product yields an average APR of 284%. *See* Exhibit C, p. 10.

46.     The average APR is so high because the vast majority of loan transactions include the payment of money—whether that is in the form of a tip, a lightning speed fee, or both—in return for obtaining EarnIn's cash advance product, which must be repaid in a

---

[4] EarnIn has represented that: a $6.00 tip will help one person; an $8.50 tip will help two people; and an $11.00 tip will help three people.

short timeframe by the consumer's next payday (usually within a week or two weeks of obtaining the cash advance).

47.     To ensure it can collect these charges from users, EarnIn requires users to: (i) have an employer that pays them on a regular basis via direct deposit (i.e., weekly, biweekly, semi-monthly, monthly); (ii) link the bank account to which their paychecks are directly deposited to EarnIn's app; and (iii) authorize EarnIn to automatically debit the linked accounts on payday in an amount that is equal to the advance a user receives and the charges a user agrees to pay.

48.     Users cannot obtain cash advances without verifying their employment, linking the account to which paychecks are deposited to EarnIn's app, and allowing EarnIn to automatically debit linked accounts on their payday.

49.     Before issuing cash advances, EarnIn performs a proprietary credit check on a user's linked bank account to ensure that the account will have sufficient funds to repay EarnIn's automatic account debits on payday.

50.     The purpose of this credit check is to guard against the risk of non-payment.

51.     EarnIn will not issue cash advances unless it believes it will be able to automatically deduct its advances, with any charges, from a linked account immediately after a user's employer deposits a paycheck on payday.

52.     The requirements that EarnIn imposes to obtain an advance has the practical effect of ensuring that EarnIn obtains repayment on the overwhelming majority of cash advances that it issues.

12

53.     Moreover, consumers do not agree to pay EarnIn's tips or lightning speed fees after they obtain or receive an advance; instead, they pay these charges before advances are issued or received.

54.     That agreement becomes part of the loan contract, with any lightning speed fees or tips that a consumer has agreed to pay being incorporated into the automatic account debit rights that EarnIn obtains as part of the loan contract.

**C.     Plaintiffs have been injured by purchasing cash advances from EarnIn.**

55.     EarnIn sold Plaintiffs cash advances that are unenforceable and void under North Carolina law, and Plaintiffs paid lightning speed fees and tips to obtain those cash advances.

56.     EarnIn caused injury to Plaintiffs by collecting money from them—including, principal, lightning speed fees, and tips on cash advances—that EarnIn was prohibited from collecting under North Carolina law.

57.     Plaintiff Stow has purchased multiple cash advances from EarnIn, where he often paid lightning speed fees and tips. For example, the following receipt shows a $150 cash advance purchased by Plaintiff Stow on April 10, 2025, for which he paid a $5.99 lightning speed fee and $1 tip. EarnIn collected the principal, lightning speed fee, and tip from Plaintiff Stow by debiting those amounts from his bank account on his next payday, April 25, 2025.



58. For this cash advance purchased by Plaintiff Stow, the $5.99 lightning speed fee and $1 tip paid on a $150 principal with a 15-day repayment term results in an APR of 113.39%.

59. Plaintiff Lofton has purchased multiple cash advances from EarnIn, where she often paid lightning speed fees and tips. For example, the following receipt shows a $50 cash advance purchased by Plaintiff Lofton on December 13, 2023, for which she paid a $2.99 lightning speed fee and $1 tip. EarnIn collected the principal, lightning speed fee, and tip from Plaintiff Lofton by debiting those amounts from her bank account on her next payday, December 21, 2023.



60. For this cash advance purchased by Plaintiff Lofton, the $2.99 lightning speed fee and $1 tip paid on a $50 principal with an 8-day repayment term results in an APR of 364.09%.

61. Plaintiff Bunn has purchased multiple cash advances from EarnIn, where she often paid lightning speed fees and tips. For example, the following receipt shows a $50 cash advance purchased by Plaintiff Bunn in 2023, for which she paid a $2.99 lightning speed fee. EarnIn collected the principal and lightning speed fee from Plaintiff Bunn by debiting those amounts from her bank account on her next payday. Plaintiff Bunn was paid on a monthly basis at the time she purchased this advance.



62. For this cash advance purchased by Plaintiff Bunn, the $2.99 lightning speed fee paid on a $50 principal with a 30-day repayment term results in an APR of 72.76%.

63. EarnIn's lightning speed fees and tips consistently translate into triple-digit APRs for North Carolina consumers who purchase cash advances from EarnIn.

64. For example, EarnIn charges a $3.99 lightning speed fee for cash advances $100 or less. With a principal of $100 and a loan repayment term of 14 days, the $3.99 lightning speed fee translates into an APR of 104.03%.

65. Similarly, EarnIn charges a $5.99 lightning speed fee for cash advances over $100. With a principal of $150 and a loan repayment term of 14 days, the $5.99 lightning speed fee translates into an APR of 104.11%.

66. These APRs remain excessive even for consumers paid on a monthly basis who may have a longer repayment term. For example, a $3.99 lightning speed fee on a $100 cash advance with a 30-day repayment term translates into an APR of 48.55%.

67. These APRs are only increased further when consumers pay a tip.

68. Plaintiffs purchased cash advances from EarnIn for personal, family, or household purposes.

**D. EarnIn's cash advance product is unlawful under North Carolina law.**

69. Chapter 24 of North Carolina's General Statutes sets the maximum rate of interest at 16% for loans of $25,000 or less. N.C.G.S. § 24-1.1(a)(1), (c).

70. The CFA imposes additional licensing requirements for persons who receive charges for making small-dollar loans. The CFA provides at N.C.G.S § 53-166(b):

> **Scope.** No person shall engage in the business of lending or servicing a loan in an amount of twenty-five thousand dollars ($25,000) or less and contract for, exact, or receive, directly or indirectly, on or in connection with the loan, any charges whether for interest, compensation, consideration, or expense, or any other purpose whatsoever, that in the aggregate are greater than permitted by Chapter 24 of the General Statutes, except as provided in and

16

authorized by this Article, and without first having obtained a license from the Commissioner.

71.     The CFA provides that loans made in violation of the law are "void," and parties "in violation shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." N.C.G.S § 53-166(d).

72.     The CFA further prohibits lenders from taking an assignment of earnings from borrowers as a security for payment of a loan, provides that any such assignments are unenforceable, and deems such assignments to be "loans."

73.     Specifically, the CFA provides:

> **No Assignment of Earnings.** A licensee shall not take an assignment of earnings of the borrower for payment or as security for payment of a loan. **An assignment of earnings in violation of this section is unenforceable**. A sale of unpaid earnings made in consideration of the payment of money to or for the account of the seller of the earnings is **deemed to be a loan** to the seller by an assignment of earnings.

N.C.G.S § 53-180 (emphasis added).

74.     EarnIn's cash advances are loans under the CFA because EarnIn advances money with the understanding that it would or may be returned.

75.     EarnIn's cash advances also qualify as loans under the CFA because they provide cash to consumers and, in exchange for a cash advance, take an assignment of their earnings for payment, or as security for payment, of the loan.

76. Put another way, consumers purchase cash advances from EarnIn by selling their unpaid earnings, which is demonstrated by the fact that Defendant "schedules debits [of the cash advance] for the [consumer's] upcoming payday."[5]

77. EarnIn engages in the business of lending or servicing a loan by selling its cash advances in North Carolina.

78. And EarnIn contracts for and receives charges on such cash advances (in the form of lightning speed fees and tips), which exceed the 16% rate permitted by Chapter 24 of North Carolina's General Statutes.

79. Since EarnIn is not licensed under the CFA to contract for or receive such expenses, and is not exempt from the CFA's licensing requirement, EarnIn has violated North Carolina law by contracting for and receiving charges on its cash advances.

80. EarnIn's cash advance loans are void as a result of these violations, which means EarnIn could not (and cannot) collect, receive, or retain the principal and charges (which include lightning speed fees and tips) on any of its cash advances.

81. By collecting, receiving, and continuing to retain the principal and charges that are associated with its cash advance loans, EarnIn has and is continuing to violate North Carolina law.

## CLASS ACTION ALLEGATIONS

82. Plaintiffs bring this action individually and on behalf of all others similarly

---

[5] *When I transfer out, will I be debited on the upcoming payday?* EarnIn, https://help.earnin.com/hc/en-us/articles/360041732053-When-I-transfer-out-will-I-be-debited-on-the-upcoming-payday.

situated under Fed. R. Civ. P. 23.

83.     Plaintiffs seek to certify the following Class: "All persons that obtained a cash advance or loan from Defendant, and paid a fee or tip when obtaining that cash advance or loan from Defendant, and resided in North Carolina when they signed up for the EarnIn app, or resided in North Carolina when they obtained a cash advance or loan from Defendant."

84.     Plaintiffs reserve the right to expand, narrow, or otherwise modify the class as the litigation continues and discovery proceeds.

85.     Fed. R. Civ. P. 23(a)(1): On information and belief, there are tens of thousands of class members, making joinder of those persons impracticable. Additionally, the members of the class are identifiable through Defendant's records, Defendant's third-party service providers, and the banks through which the class members hold accounts.

86.     Fed. R. Civ. P. 23(a)(2), 23(b)(3): Plaintiffs and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over any individual issues. For example, there is a single common answer to whether Defendant's cash advance business is covered by the CFA, whether cash advances qualify as "loans" or "credit" under the relevant laws, and whether Defendant's conduct regarding its cash advances was unfair or deceptive. These common questions, and other common questions of law and fact, will predominate over individual questions, to the extent any individual questions exist.

87.     Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of the claims of the members of the class because the claims of Plaintiffs and the class are based on the same

19

legal theories and arise from the same conduct.

88. <u>Fed. R. Civ. P. 23(a)(4):</u> Plaintiffs are adequate representatives of the class because the interests of Plaintiffs and class align. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the class and have no interest antagonistic to the class. Plaintiffs retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer finance litigation specifically.

89. <u>Fed. R. Civ. P. 23(b)(3):</u> Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief Plaintiffs and the class may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiffs and the class members. Additionally, requiring Plaintiffs and the class members to file individual actions would impose a burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

### COUNT I
**Violation of the North Carolina Consumer Finance Act ("CFA")**
**N.C.G.S. §§ 53-164, *et seq.***

90. Plaintiffs incorporate the foregoing allegations into this Count.

91. Plaintiffs bring this claim individually and on behalf of the Class.

92. Defendant is a "person" as defined by the CFA. N.C.G.S. § 53-165(10).

93. The CFA prohibits a person from engaging in the "business of lending or servicing a loan in an amount of twenty-five thousand dollars ($25,000) or less" and

20

seeking to "contract for, exact, or receive, directly or indirectly, on or in connection with the loan, any charges whether for interest, compensation, consideration, or expense, or any other purpose whatsoever, that in the aggregate are greater than [16%]," unless the person is licensed under the CFA or is exempt from the CFA's licensing requirement. *See* N.C.G.S. § 53-166(a) (establishing licensing requirement); N.C.G.S. § 24-1.1(a)(1), (c) (establishing 16% rate cap).

94. The CFA prohibits persons from avoiding its licensing requirement through "any device, subterfuge, or pretense whatsoever." N.C.G.S. § 53-166(b).

95. If a person violates the CFA with respect to a loan, including engaging in covered activity without the required CFA license, the CFA provides that the loan is "void" and provides that the lender "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." N.C.G.S. § 53-166(d).

96. The CFA further prohibits persons from receiving a consumer's unpaid earnings as consideration for the payment of money, defines such transactions as loans, and provides that such assignments of earnings are unenforceable. N.C.G.S. § 53-180(b) ("**No Assignment of Earnings.** A licensee shall not take an assignment of earnings of the borrower for payment or as security for payment of a loan. An assignment of earnings in violation of this section is unenforceable. A sale of unpaid earnings made in consideration of the payment of money to or for the account of the seller of the earnings is deemed to be a loan to the seller by an assignment of earnings.").

21

97.     Defendant's cash advances are "loans" under the CFA because Defendant, among other things, expects repayment and requires consumers to sell their unpaid earnings as consideration for the cash advance.

98.     Defendant has violated the CFA by engaging in the business of lending without the requisite license, taking assignments of earnings from North Carolina consumers as consideration for the payment of money, and contracting for and receiving charges that, in the aggregate, exceed the general 16% interest rate cap.

99.     As a result of these violations, the CFA deems Defendant's cash advances as void and unenforceable loans, and further prohibits Defendant from collecting, receiving, or retaining and principal or charges (including lightning speed fees and tips) on any of the cash advances that were issued to Plaintiffs or the Class.

100.    Despite this, Defendant has collected, received, and retained principal and charges in connection with its cash advances from Plaintiffs and the Class, which has caused injury to the Class and Plaintiffs.

101.    Plaintiffs bring this count to recover on behalf of themselves and the Class actual damages, which consist of the principal and any charges on any cash advance that Defendant has issued without a CFA license.

102.    As Defendant's unlawful cash advance business is ongoing, Plaintiffs bring this count seeking injunctive relief to enjoin the unlawful practices described herein, as well as all other relief authorized by the CFA the Court deems just and proper.

22

## COUNT II
### Violation of the North Carolina Debt Collection Act ("DCA")
### N.C.G.S. §§ 75-50, *et seq.*

103.    Plaintiffs incorporate the foregoing allegations into this Count.

104.    Plaintiffs bring this claim individually and on behalf of the Class.

105.    Plaintiffs are "consumers" as defined by the DCA because they incurred a debt from Defendant for personal, family, or household purposes. N.C.G.S. § 75-50(1).

106.    Defendant's cash advances sold to Plaintiffs are "debt[s]" as defined by the DCA because they are "obligation[s] owed or due or alleged to be owed or due from a consumer." N.C.G.S. § 75-50(2).

107.    Defendant is a "debt collector" as defined by the DCA because it collects the principal and charges on cash advances sold to North Carolina consumers, thus making Defendant a "person engaging, directly or indirectly, in debt collection from a consumer." N.C.G.S. § 75-50(3). Defendant is not exempt from this statutory definition under relevant law.

108.    Defendant violated the DCA's prohibition on "collect[ing] any debt by use of any unconscionable means," which includes "[c]ollecting or attempting to collect from the consumer all or any part of the debt collector's fee or charge for services rendered, collecting or attempting to collect any interest or other charge, fee or expense incidental to the principal debt **unless legally entitled to such fee or charge**." N.C.G.S. § 75-55(2).

109.    Defendant was not legally entitled to collect lightning speed fees and tips from Plaintiffs and the Class members on cash advances because the CFA renders

23

Defendant's cash advances void and prohibits Defendant from collecting any charges related to such advances. *See* N.C.G.S. § 53-166(d) (for void loans, persons "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan.").

110. In collecting such lightning speed fees and tips on cash advances made to Plaintiffs and Class members, Defendant violated the DCA's prohibition on unconscionable means of debt collection. N.C.G.S. § 75-55(2).

111. Plaintiffs and Class members suffered injury when Defendant collected lightning speed fees and tips from them on cash advances that Defendant was prohibited from collecting under North Carolina law.

112. Plaintiffs bring this count to recover on behalf of themselves and similarly-situated Class members all damages authorized by the DCA, including actual damages, statutory damages not less than $500 nor greater than $4,000 for each violation, and punitive damages. N.C.G.S. § 75-56(b)-(c).

113. As Defendant's unlawful debt collection practices are ongoing, Plaintiffs bring this count seeking injunctive relief to enjoin the unlawful practices described herein, as well as all other relief authorized by the DCA the Court deems just and proper.

### COUNT III
**Violation of the North Carolina Unfair and Deceptive Practices Act ("UDPA")**
**N.C.G.S. §§ 75-1, *et seq.***

114. Plaintiffs incorporate the foregoing allegations into this Count.

115. Plaintiffs bring this claim individually and on behalf of the Class.

24

116. The UDPA prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C.G.S. § 75-1.1(a).

117. Defendant's cash advances are in or affect commerce because they are "business activities," as Plaintiffs paid Defendant money in exchange for cash advances. N.C.G.S. § 75-1.1(b).

118. Defendant engaged in unfair or deceptive acts or practices by, among other things, initiating automatic account debits to obtain repayment of its cash advance principal and fees, and actually obtaining repayment of those amounts, when Defendant had no right to initiate those automatic account debits, Plaintiffs and the Class had no obligation to pay those amounts, and Defendant had no right to receive those amounts—because Defendant's cash advances were void and unenforceable.

119. Plaintiffs and Class members suffered injury when Defendant collected principal, lightning speed fees, and tips from them on cash advances that Defendant was legally prohibited from collecting under North Carolina law.

120. Defendant's violations of the UDPA are willful, as it has sold cash advances to tens of thousands of North Carolina consumers for years while flouting state law requirements to obtain the necessary license.

121. Plaintiffs bring this count to recover on behalf of themselves and similarly-situated Class members all damages authorized by the UDPA, including actual damages, which consist of the principal and charges on cash advances that Defendants were

25

prohibited from collecting, treble damages, and reasonable attorney's fees. N.C.G.S. §§ 75-16, 75-16.1.

122.    As Defendant's unfair or deceptive practices are ongoing, Plaintiffs bring this count seeking injunctive relief to enjoin the unlawful practices described herein, as well as all other relief authorized by the UDPA the Court deems just and proper. N.C.G.S. § 75-19.

## JURY TRIAL DEMANDED

Plaintiffs request a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

a.    An order certifying the proposed Class, appointing Plaintiffs as representatives of the proposed Class, and appointing undersigned counsel as counsel for the proposed Class;

b.    An order awarding all damages available by law, with pre- and post-judgment interest;

c.    An order requiring Defendant to repay all amounts associated with any cash advance that Defendant made to Class members and any fees or tips paid by Class members to Defendant for such cash advance;

d.    An order awarding attorneys' fees and costs;

e.    An order declaring Defendant's conduct unlawful and enjoining further unlawful acts; and

f.    An order awarding all other relief that is just, equitable, and appropriate.

Respectfully submitted,

Dated: May 19, 2025                    By:    */s/ Troy Shelton*
                                              Troy D. Shelton
                                              **Dowling PLLC**
                                              3801 Lake Boone Trail, Suite 260
                                              Raleigh, NC 27607
                                              Tel: (919) 529-3351
                                              tshelton@dowlingfirm.com

                                              Kevin Abramowicz*
                                              Kevin Tucker*
                                              **East End Trial Group LLC**
                                              6901 Lynn Way, Suite 503
                                              Pittsburgh, PA 15208
                                              Tel: (412) 223-5740
                                              Fax: (412) 626-7101
                                              kabramowicz@eastendtrialgroup.com
                                              ktucker@eastendtrialgroup.com

                                              Jason S. Rathod*
                                              Randolph T. Chen*
                                              **Migliaccio & Rathod LLP**
                                              412 H St NE
                                              Washington, DC 20002
                                              Tel: (202) 470-3520
                                              jrathod@classlawdc.com
                                              rchen@classlawdc.com

                                              *Attorneys for Plaintiffs*

                                              * *Pro hac vice forthcoming*

27