# EXHIBIT A

# California Department of Financial Protection and Innovation

# 2021 Earned Wage Access Data Findings
Analysis completed Q1 2023

## EXECUTIVE SUMMARY

This analysis provides an overview of the earned wage access (EWA) industry from data collected in 2021 through Memorandum of Understanding (MOU) Agreements between several EWA companies and the Department of Financial Protection and Innovation (DFPI). These findings focus on amounts advanced, annual percentage rates, days to repay, frequency of use, and other related information to assess impacts to consumers.

In general, the EWA companies considered in this analysis operate via two major fee structures: transactions and subscription fees. A transaction-based company may accept tips, charge fees, and collect optional fees for faster service. EWA companies that accept tips typically maintain that their tips are wholly voluntary and have no effect on their EWA services or availability of future EWA advances. Below are some key highlights of the 2021 Earned Wage Access Data Findings:

There was a total advanced amount of $765 million reported by responding companies.

- For the 5.8 million transactions completed by tip-based companies, providers received tips 73% of the time.
- The average annual APR was 334% for tip companies and 331% for the non-tip companies.
- Tips generated a total of $17.55 million in revenue, and optional fees generated $6.24 million.
- When a tip was provided by the consumer, the average tip amount was $4.09.
- Most advance amounts (80%) are between $40 and $100.
- The average quarterly growth rate for EWA transactions was 17%.
- The average time for consumers to repay was 10 days.
- Among the companies that reported the advanced amount as percent of paycheck, it ranged from 6% to 50% of pay.
- The transaction point of receiving and repaying the funds represented 67% of complaints from EWA customers.

## BACKGROUND

The California Consumer Financial Protection Law (CCFPL) became effective in 2021, giving the Department expanded oversight authority to further protect consumers and respond to emerging

1

innovative financial products and services not previously regulated by DFPI.[1] In 2021, the DFPI entered into 11 MOU agreements with EWA companies, which requested quarterly data addressing advanced payment amounts, transactions, numbers of advance requests per customer, how transactions occur (e.g., through the employer, bank account, debit card), delinquencies, annual percentage rates, and other related information for 2021. A total of seven[2] EWA companies responded with quarterly summary reports, amounts advanced, charges, complaint information, and key terms.

## BUSINESS MODELS & FEE STRUCTURES

Earned wage access companies are broadly based on two types of business models: 1) a business-to-business (B-to-B) model in which the EWA company contracts with employers who then roll the services into benefits for their employees and 2) a direct-to-consumer (D-to-C)[3] model in which the EWA company works directly with the employee, eliminating the employer from transactions.

With a business-to-business model, the EWA company typically works with the employers' payroll processing function to gauge advance payment amounts (amounts cannot surpass the amount earned during the pay period) and arranges for repayments when employees are paid. Advances can be funded either by the employer (with the employee's salary deducted by the advance amount at the time of payroll processing) or by the EWA company that is reimbursed by the employer (who debits the employee's account) at the time of payroll processing.

In the direct-to-consumer model, the EWA company usually requests proof of employment or regular income from the consumer at the time of sign-up and requires access to a checking or savings account with direct deposits that will allow the EWA company to recoup the advances when users receive their regular income. The D-to-C model often has features such as integration with the consumer's bank account.[4]

**Fee Structures**

In general, the earned wage access companies considered in this analysis operate via two major fee structures: transactions and subscription fees.

*Transaction-based companies*

A transaction-based company may accept tips, charge fees, and collect optional fees for faster service. EWA companies that accept tips typically maintain that their tips are wholly voluntary and have no effect on their EWA services or availability of future EWA advances.

---

[1] Department of Financial Protection & Innovation. (2022, June 1). *Glossary of Financial Terms*. The Department of Financial Protection and Innovation. Retrieved March 16, 2023, from https://dfpi.ca.gov/ca-consumer-financial-protection-law/.

[2] Of the eleven MOUs that were signed, two companies did not submit data, one company canceled their EWA service offering, and one submitted file types that were unusable.

[3] Also known as business-to-consumer model.

[4] Weinberger, Evan (2022, February 3). *Earned-wage access products face fresh scrutiny from CFPB, states*. Bloomberg Law. Retrieved March 16, 2023, from https://news.bloomberglaw.com/banking-law/earned-wage-access-products-face-fresh-scrutiny-from-cfpb-states.

> ***A Note on Tips, APRs and Interest Rates.***
>
> An Annual Percentage Rate (APR) is the annual cost of credit expressed as a percentage. An APR is different from an interest rate because an APR can include fixed costs that a consumer pays in addition to periodic interest. In the "Annual Percentage Rate" section below, the DFPI includes tips in APR calculations. Stakeholders have various perspectives on how to treat EWA products and optional charges under the federal Truth in Lending Act (TILA). The DFPI takes no position on questions of federal law in this analysis, but includes tips in its APR calculations herein to help compare EWA products to other credit products like payday loans.

*Subscription-based companies*

A subscription-based company charges a fixed monthly fee and may accept optional charges for faster service.

In this analysis there were five transaction-based companies, of which three had a tip-based model and two had a non-tip-based model. In addition, there were two companies that had a subscription-based model. All seven companies are included in this analysis, except for the APR section. Monthly subscription-fee-based companies were excluded from APR calculations, as discussed further below.

## METHODOLOGY & DATA

Data was collected using a standard template that was provided to companies upon signing the MOU. As a result of varying MOU start dates, complete calendar data is unavailable for some companies. The template included a request for summarized quarterly data, transaction level data and complaint data. However, transactional data did not always exactly match summarized quarterly and annual year to date numbers. This analysis uses transaction data when possible and, when necessary, quarterly reported data is utilized. Furthermore, transactional averages are weighted by the number of transactions. Data averages are based on simple non-weighted averages.

This analysis focuses on the following numeric data:

- Advance Payment Amounts
    - Advanced Payment Amounts by Model Type
- Annual Percentage Rates
    - Tip and Non-Tip models
    - Average APR by Advanced Amount
    - Amount Paid by Consumers
- Average Days to Repay
- Frequency of Use
- Number of Missed Payments
- Percent of Paycheck

A qualitative analysis is also carried out to highlight key trends within complaint data provided by

companies, as discussed further below.

# NUMERIC DATA KEY FINDINGS

**Advance Payment Amounts**

In 2021, seven companies[5] provided a total of approximately $765 million[6] in advance payments to California consumers. Across companies, there was a 60% increase in advanced amounts from Quarter 1 to Quarter 4, or approximately $91 million worth of advanced amounts.

**Figure 1: 2021 EWA Advanced Payment Amounts[7]**



*Advanced Payment Amounts by Model Type*

In 2021 companies using transaction fee structures advanced $660,681,096 in funds to consumers. Of those, companies using tip-based models advanced $452,100,647 and non-tip models advanced $208,580,450. Companies with subscription fee structures advanced $104,342,006 to consumers. For the seven companies combined, the average growth rate in advanced payments across quarters was 17%. The increase in advanced amounts is partially due to a 15% average quarterly increase in the transaction count growth rate.

---

[5] Five companies included transactional data for all four quarters. Two of the companies reported transactional data for Quarters 3 and 4 only, but reported summary data for Quarters 1 and 2. For those two companies, the DFPI used their summarized quarterly reports for Quarters 1 and 2 to determine the Advanced Amounts for those quarters because transactional data was not available.

[6] The numbers in this analysis are rounded to the nearest million, where applicable.

[7] Based on a total of 8,372,087 number of transactions, of which, 7,818,068 are from all 7 company transaction level data plus Q1 and Q2 EWA Reports for the non-tip companies. Those with zeros or blank number of days to repay were removed for this report.



Figure 2: 2021 EWA Advanced Payment Amounts[8]

## Annual Percentage Rates

The Annual Percentage Rate (APR) is the total cost of credit, including interest, fees, and other charges, expressed as an annual rate. The Annual Percentage Rate (APR) is the standard way to compare the annual cost of credit across loan products.[9] In some cases, APRs can also reflect the interest rate, points, fees, and other charges paid.[10]

The DFPI includes mandatory fees, tips, and other optional fees[11] in the 2021 Annual Percentage Rate calculations discussed below to aid policy analysis and allow better comparisons with other forms of financing. DFPI applies a single advance, single payment transaction APR formula[12] used for financial products to understand total consumer costs for EWA products.

Both tip and non-tip companies under transaction-based fee structures are analyzed in this section. Subscription-based companies are excluded as further discussed in this document.

The APR formula utilized in this analysis is represented below.

---

[8] Based on a total of 8,372,087 number of transactions, of which, 7,818,068 are from all 7 company transaction level data plus Q1 and Q2 EWA Reports for the non-tip companies. Those with zeros or blank number of days to repay were removed.

[9] Department of Financial Protection & Innovation. (2002, June 1). *Glossary of Financial Terms.* The Department of Financial Protection and Innovation. Retrieved March 16, 2023, from https://dfpi.ca.gov/glossary-of-financial-terms/.

[10] Consumer Financial Protection Bureau. (2020, September 4). *What is the difference between a mortgage interest rate and an APR?* Consumer Financial Protection Bureau. Retrieved March 16, 2023, from https://www.consumerfinance.gov/ask-cfpb/what-is-the-difference-between-a-mortgage-interest-rate-and-an-apr-en-135/#:~:text=An%20annual%20percentage%20rate%20(APR)%20is%20a%20broader%20measure%20of,higher%20than%20your%20interest%20rate.

[11] Expedited access to advance.

[12] Consumer Financial Protection Bureau. (n.d.). *Appendix J to Part 1026 — Annual Percentage Rate Computations for Closed-End Credit Transactions.* Consumer Financial Protection Bureau. Retrieved March 16, 2023, from https://www.consumerfinance.gov/rules-policy/regulations/1026/j/.

California Department of Financial Protection and Innovation     6

### Figure 3: APR Formula



Annual Percentage Rates are calculated for five companies with transaction-based fee structures where they collect mandatory charges based on advance wage access transactions, accept tips, and/or may charge optional fees for faster service. Two of the five companies did not report days to repay for Quarters 1 and 2, and those quarters have been excluded from all APR calculations. Subscription Fee Structures are also excluded from the analysis section, as it is difficult to include subscription fee costs when making APR calculations. For this reason, APR calculations for subscription fee models would have understated the cost of subscription-based EWA programs if those calculations were included in the DFPI's analysis. This issue may warrant further study.

*Tip and Non-Tip Models*

The figure below identifies APRs for companies with tip-based transactions and those with non-tip transactions. Calculations are weighted based on the total number of transactions across all five companies in which APRs could be calculated. Tip models include three companies that accept tips and optional fees. Non-tip models include two companies that did not accept tips but charged transactional fees.

Below are some key findings:

- In 2021, for the 5,827,120 transactions completed by tip-based companies, providers received tips 73% of the time.
- The average APR for the three tip-based fee structure companies was 334%.[13]
    - The tip-based company APRs ranged between 328% and 348% (weighted quarterly average).
    - Tips generated a total of $17.55 million in revenue, and optional fees generated $6.24 million.
    - When a tip was provided by the consumer, the average tip amount was $4.09.
    - Most advance amounts (80%) are between $40 and $100, with 51% between $80 and $100.
- The average APR for the two non-tip fee structure companies was 331%.[14]
    - Non-tip company APRs for Quarter 3 and Quarter 4 ranged between 315% and 344% (weighted quarterly average).[15]

---

[13] Based on a total of 5,827,120 transactions, across five companies (3 tip and 2 non-tip companies). Those with zeros or blank number of days to repay were removed for this report.
[14] Does not include non-tip APRs for Q1 and Q2 because appropriate transaction level data was not available.
[15] Fee Based APRs for Quarter 1 and Quarter 2 could not be calculated because transaction level data was not available.

o Fees generated a total of $4.31 million in revenue.[16]

**Figure 4: APRs by Model Type**[17]



The APRs for both tip-based companies and non-tip company advances for EWA services are comparable to the average APRs for licensed payday lenders in California.[18]

*Average APR by Advanced Amount*

The figure below displays how consumers of both tip-based and non-tip-based companies who receive small advances ($0-$20) pay a higher APR than those that receive larger advances. In fact, those with advances larger than $200 do not pay tips. Only 504 tip-based transactions were over $200, and none of them tipped or had a fee. There were 167,991 non-tip-based transactions over $200. However, the fee-to-advanced amount ratio decreases as the amount advanced increases.

---

[16] Fees generated includes Q1 and Q2 fee amounts for non-tip models reported in the EWA reports plus Q3 and Q4 transactional data.

[17] Based on 7,148,673 transactions across five transaction-based fee structure companies. Tip-based models account for 5,827,120 transactions. Non-tip models account for 1,321,553 transactions that did not include tips but may include other transactional fees. Non-tip company data was unavailable for Q1 and Q2. One company did not report days to repay and as result, APRs could not be calculated. Another did not begin reporting transactional data until Q3.

[18] Department of Financial Protection & Innovation. (2022, July) *Annual Report of Payday Lending Activity Under the California Deferred Deposit Transaction Law*. Department of Financial Protection & Innovation. Retrieved March 16, 2023, from https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/07/DFPI_AnnualReport_CDDTL-2021.pdf.

**Figure 5: Tip-based and Non-Tip APRs by Advanced Amount[19]**

| Advance Amount Group | Non-Tip Based | Tip Based |
|---|---|---|
| $0 to $20 | 1336% | 1007% |
| >$20 to $40 | 539% | 623% |
| >$40 to $60 | 281% | 407% |
| >$60 to $80 | 195% | 280% |
| >$80 to $100 | 166% | 219% |
| >$100 to $200 | 106% | 33% |
| >$200 to $500 | 51% | 0% |
| >$500 | 23% | 0% |

Both tip-based and non-tip-based companies average high APRs for smaller advanced amounts; however, non-tip-based companies average higher APRs on advanced amounts less than $20 and tip-based companies have significantly higher APRs for ranges between $20 and $100. Further information may be required to understand the marketing, operations, and strategic decisions behind these figures.

*Amount Paid by Consumers*

The figure below displays the average percent paid in tips and fees in relation to the total amount repaid to EWA companies ((Tip + Fees) / (Tip + Fees + Advanced Amount)). Similar to the high average APRs for those consumers receiving smaller advances, as a whole, those with smaller advance amounts (less than $20) are paying proportionately higher amounts (average tip + fee) across tip and non-tip models.

---

[19] Based on 7,148,673 transactions across five transaction-based fee structure companies. Tip-based models account for 5,827,120 transactions. Non-tip models account for 1,321,553 transactions that did not include tips but may include other transactional fees. Non-tip company data was unavailable for Q1 and Q2. One company did not report days to repay and as result, APRs could not be calculated. Another did not begin reporting transactional data until Q3.

**Figure 6: Amount Paid by Consumers[20]**

[Bar chart showing Tip and/or Fee percent of Total Cost of EWA by Advanced Amount Range:
- $0 to $20: Tip Accepted 11%, Non-Tip 16%
- >$20 to $40: 9%, 8%
- >$40 to $60: 7%, 5%
- >$60 to $80: 5%, 4%
- >$80 to $100: 4%, 3%
- >$100 to $200: 1%, 2%
- >$200 to $500: 0%, 1%

Legend:
- Average Tip+Fee percent of Total Cost of EWA (Tip Accepted Model)
- Average Fee percent of Total Cost of EWA (Non-Tip Accepted Model)]

## Average Days to Repay

The average days to repay advances[21] ranged from 8.9 to 12.1 days, with an average of 10.07 days. Average days to repay was based on the average of all transactions reported by companies for each quarter.

Subscription companies' customers averaged 11.9 days to repay, while tip and non-tip companies' customers averaged 10.1 and 9.1 respectively. For tip-based companies, one possible reason for longer repayment numbers may be less ability for these companies to recoup repayments from bank accounts that are not directly linked to payroll systems.

---

[20] Based on 7,148,673 transactions across five transaction-based fee structure companies. Tip-based models account for 5,827,120 transactions. Non-tip models account for 1,321,553 transactions that did not include tips but may include other transactional fees. Non-tip company data was unavailable for Q1 and Q2. One company did not report days to repay and as result, APRs could not be calculated. Another did not begin reporting transactional data until Q3. EWA Costs Percentages are calculated using the Formula (Tip+Fee)/(Tip+Fee+Advanced Amount). For example if Tip = $10, Fee = $10, and Adv Amt = $100, the calculation would be: ($10+$10)/($10+$10+$100) = .1666 or 16.66%.

[21] The average calculation of all advances reported and repaid throughout the quarter. Or the time from the advance date to the time the EWA company obtained reimbursement.

**Figure 7: 2021 EWA Average Days to Repay by Tip/Non-Tip/Subscription[22]**



## Frequency of Use

The average number of times a consumer used advances per quarter was nine and ranged from 1 to 25 times. Companies with higher transaction amounts have a higher frequency of use.

**Figure 8: 2021 EWA Frequency of Use[23]**

Two companies had significant increases in consumer use frequency over the course of the year. One company had a two-fold increase, and the second had an eight-fold increase. Additional data and analysis may be required to explain the trends.

---

[22] Based on 7,818,067 transactions across seven companies. Tip-based models account for 5,827,120 transactions. Non-tip models account for 1,321,553 transactions that did not include tips but may include other transactional fees. Non-tip company data was unavailable for Q1 and Q2. Subscription models account for 669,394 transactions.

[23] Based on company calculated data for six companies. One company did not provide Frequency of Use data.

California Department of Financial Protection and Innovation 11

## Number of Missed Payments

The number of missed payments[24] ranged from 5 to 16,921 throughout the year, with the average being 5,504 across companies. Three companies had the highest number of missed payments in 2021. This may have been due to their D-to-C business models. The B-to-B model's integration with payroll systems allows companies to be repaid automatically and may more accurately calculate consumers' earned wages.

Figure 9: 2021 EWA Number of Missed Payments[25]



## Percent of Paycheck

This metric, intended as a ratio, was described on the EWA template as "Money Advanced from Paycheck."[26] The seven companies reviewed had various ways of reporting this metric. Three companies reported this metric as a percentage, while four companies reported this metric as a dollar amount. Percent of Paycheck among the three companies that reported this data point as a ratio ranged from 6% to nearly 50%.

---

[24] Missed payments refers to times when the provider does not collect a payment on the date originally scheduled for collection. Includes company-reported delinquent, default, and no payments.
[25] Based on company calculated data for six companies. One company did not provide Missed Payment data.
[26] One of the companies has a limit on the amount of money that can be advanced, $250.



Figure 10: 2021 EWA Percent of Paycheck[27]

## COMPLAINT DATA

As part of the MOUs, companies were asked to provide information regarding complaints received and their resolutions. Reporting companies may have had different criteria for what they classified as a complaint. For this reason, the information reported below may not reflect a complete picture of the issues or concerns raised by EWA customers during the reporting period. In this section, a total of 345 complaints across six companies that responded to the requested MOU information were analyzed for trends.

Companies' consumer complaints occasionally entailed more than one issue. Issues were interlinked and not mutually exclusive. For example, an advance problem where a customer did not receive an advance could also be classified as a settlement problem when the customer experienced a reduction in their direct deposit because of the missing advance. In those cases, DFPI assigned the most appropriate or prominent category to the complaint or inquiry – or in this case, it would be coded as an advance issue.

**Complaint/Inquiry Data Key Findings**

*Fund Transactions*

The transaction point of receiving and repaying funds accounted for 67% of complaints and inquiries from those who used the service. Approximately 34% of complaints concerned settlement issues including claims that a consumer was overcharged for a repayment or the payment amount exceeded the advance amount.

Advance[28] payment issues accounted for 33% of claims that the advance was never issued, that a consumer was unable to receive a requested advance due to reaching their advance limit, or that the consumer was unable to access the advance request due to a technical or password problem.

---

[27] The above chart only displays companies that presented the metric, "Money Advanced from Paycheck" as listed in their quarterly EWA Summary as a ratio.
[28] Advances to workers or consumers prior to their normal pay cycle.

California Department of Financial Protection and Innovation 13

Other issues accounted for 19% of complaints and included incidents surrounding company-specific products, rewards, and EWA services, such as referral bonuses or bonuses to link a new account to the company's advance payment application. In the case of one company, the EWA feature is part of a suite of products that may be directly or indirectly impacted by an EWA transaction.

Unauthorized activity and potential fraud accounted for 7% of consumer complaints or inquiries. Customers claimed to have unauthorized advance requests on their statements or that they did not set up an account. The DFPI review of both the claims and resolutions indicates that most of these customer claims were valid and the companies reimbursed repayments for fraudulent advances or closed accounts. In a few cases, the EWA company worked with customers to verify transactions, and the customers withdrew the fraud allegations. Further reporting may be required to clearly distinguish between unauthorized activity and potential fraud (for security risk).

Employer-related issues accounted for 6% of consumer inquiries. Complaints included employer actions such as notifying the EWA company of an employee's leave, yet not informing the employee that they would no longer be able to use the advanced access feature of the EWA application. Another example would be if the employer neglected to inform an EWA company of a changed payroll date initiating settlement prior to a user's payroll deposit, thus resulting in an overdraft. All the employer-related complaints occurred in companies with B-to-B business models. Problems for low-wage workers who work variable hours or may have extensive periods of leave warrant additional research.

**Figure 11: 2021 EWA Complaint or Inquiry Types[29]**



---

[29] Based on 345 complaints reported by six companies.

*Complaints or Inquiries by Business Model*

Complaints were nearly evenly split between B-to-B models (174) and D-to-C (171) models.

Figure 12: 2021 EWA Provider Complaints or Inquiries



## CONCLUSION

These findings highlight early trends of earned wage access company practices in California based on data from several prominent market actors. However, further study is needed to understand full impacts to consumers. Additional consumer-level data on out-of-pocket costs, motivations for increased frequency of use, and the consumer demographics in EWA use (i.e., age, race, income, credit score, geography, etc.) would help the DFPI assess trends and risks.