IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JOSHUA STOW, SHARONE BUNN, and TIARA LOFTON, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:25-CV-391 |
| ACTIVEHOURS, INC., d/b/a EARNIN, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, Chief District Judge.

The plaintiffs, Joshua Stow, Sharone Bunn, and Tiara Lofton, used an application on their cellphones to borrow money from the defendant, Activehours, Inc., doing business as "EarnIn." Individually and on behalf of a proposed class, they assert that the fees and interest charged by EarnIn violate North Carolina consumer protection laws. EarnIn moves to compel arbitration on the claims, contending that the plaintiffs agreed to arbitration when they created their EarnIn accounts. EarnIn's motion to compel arbitration will be granted, because all three plaintiffs entered into valid online agreements with arbitration provisions.

    I.    **OVERVIEW OF CLAIMS**

According to the complaint, EarnIn offers cash advances through its internet lending application. Doc. 1 at ¶¶ 13–14. The application advertises that it allows

consumers to access their paychecks early. *Id*. at ¶ 16. The application provides up to $100 in cash advances at a time and up to $750 per pay period. *Id*. at ¶ 15. EarnIn advertises itself as providing "an instant source of money directly from a cell phone" and as "a way for consumers to access their earned wages before payday." *Id*. at ¶¶ 16–17. It charges consumers fees to obtain that immediate access. *Id*. at ¶¶ 24–29. It also requests a "tip" charge during the transaction. *Id*. at ¶¶ 31–40.

The plaintiffs each used the application, created accounts, filled out EarnIn's cash advance application, and paid the mandatory "lightning speed" fees to obtain immediate access to those cash advances. *Id*. at ¶¶ 22, 55–62. They allege that EarnIn's charges and fees violate North Carolina state law governing cash advance practices. *Id*. at ¶ 56. For example, they allege that EarnIn's "lightning speed fee" is unrelated to costs associated with providing loans quickly and instead is a form of "compensation for lending money," *id*. at ¶ 30, that constitutes a predatory loan. *Id*. at ¶ 98. They allege that the "tips" do not go to workers but rather are a revenue source for EarnIn and that EarnIn's use of that word is misleading and deceptive. *Id*. at ¶ 32. For these and other actions, they assert causes of action under the North Carolina Consumer Finance Act, the North Carolina Debt Collection Act, and the North Carolina Unfair and Deceptive Trade Practices Act.

## II. THE MOTION TO COMPEL ARBITRATION

EarnIn moves to compel arbitration on the claims. Doc. 16. It contends that the plaintiffs agreed to arbitrate their claims by accepting EarnIn's Terms of Service. Doc. 17 at 7. The plaintiffs acknowledge that the Terms of Service provisions include an arbitration agreement and a class action waiver. *See generally* Doc. 22. But they contend

that the notices of these provisions were effectively buried[1] and did not provide constructive notice, so that no enforceable agreement was formed under the applicable California law. *Id*. at 8.

   III.   FACTS

EarnIn has submitted evidence about its sign-up process and the Terms of Service accessible during that process, Docs. 18-1 through 18-2,[2] including images reflecting the screens the plaintiffs used to open accounts and take out loans. Docs. 19-1 through 19-3. The plaintiffs do not dispute the authenticity of this evidence. *See generally* Doc. 22 (using EarnIn's evidence and challenging the Terms of Service agreements on other grounds). Both Terms of Service provisions contain arbitration agreements. Doc. 18-1 at 2, 14–16; Doc. 18-2 at 2, 24–32. Specifically, the September 2021 Terms of Service agreement states, "unless you opt out of arbitration within thirty (30) days . . . , disputes between you and EarnIn will be resolved by binding individual arbitration." Doc. 18-1 at 2; *see also id.* at 14. The April 2023 Terms of Service agreement states, "[t]his agreement is subject to mandatory arbitration" and "[y]ou and EarnIn agree that the sole and exclusive forum and remedy for resolution of a claim be final and binding arbitration." Doc. 18-2 at 2, 24.

---

   [1] Each plaintiff submitted a declaration that they do not remember accepting the Terms of Service agreements and became aware of the provisions only after EarnIn filed its motion to compel. Doc. 22-1 at 1; Doc. 22-2 at 1–2; Doc. 22-3 at 1–2.

   [2] EarnIn contends that Ms. Bunn and Mr. Stow agreed to the September 2021 Terms of Service based on their account creation dates in 2022. Doc. 17 at 12. It asserts that Ms. Lofton agreed to the April 2023 Terms of Service based on her account creation date in May 2023. *Id*. at 13.

3

"Where the authenticity of screenshots is not subject to factual dispute, courts may decide the issue of constructive notice as a pure question of law." *See Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1152 n.2 (9th Cir. 2025) (cleaned up). Because there is no dispute of fact, the Court need not conduct a trial. *See Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019) (discussing when a trial is required on whether there is an agreement to arbitrate).

Additional facts will be discussed when relevant.

## IV. DISCUSSION

### A. Applicable Law

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–14, a litigant can obtain an order to compel arbitration if it proves that: "(1) a dispute exists between the parties; (2) the dispute falls within the scope of a written, valid agreement that includes an arbitration provision; (3) the parties' agreement relates to interstate or foreign commerce; and (4) the opposing party has failed or refused to arbitrate the dispute at hand." *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 595 (4th Cir. 2023).

The FAA reflects a "liberal federal policy favoring arbitration agreements" as a means of settling disputes. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018) (cleaned up). It "requires courts to enforce covered arbitration agreements according to their terms." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 178 (2019). Once a litigant establishes the existence of an arbitration agreement and one party's failure to comply, the FAA mandates that "the court shall make an order directing the parties to proceed to arbitration." 9 U.S.C. § 4; *see also Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024).

"Arbitration is a matter of contract." *Coinbase*, 602 U.S. at 147 (cleaned up). District courts must "engage in a limited review to ensure that a dispute is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Murray v. United Food & Com. Workers Int'l Union*, 289 F.3d 297, 302 (4th Cir. 2002) (cleaned up); *see also Mystic Retreat Med Spa & Weight Loss Ctr., PLLC v. Ascentium Cap., LLC*, No. 21-CV-515, 2023 WL 362814, at *5 (M.D.N.C. Jan. 23, 2023) ("A court may order arbitration of a dispute only where it is satisfied that the parties entered into an agreement to arbitrate it.").

The FAA "requires that the district court—rather than an arbitrator—decide whether the parties have formed an agreement to arbitrate." *Berkeley*, 944 F.3d at 234. Because the issue of whether an arbitration agreement has been formed is an issue of contract law, courts apply the "ordinary state-law principles that govern the formation of contracts" in reviewing a challenge under § 4 of the FAA. *Id.* at 236 (cleaned up); *accord First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

Here, the parties agree that California law applies. Doc. 17 at 18; Doc. 22 at 8. For "sign-in wrap agreements" like those at issue here, California law requires that the consumer: (1) was given "reasonably conspicuous notice of the terms"; and (2) "unambiguously manifested their assent to those terms." *Chabolla*, 129 F.4th at 1154–55 (cleaned up).

"To be conspicuous, notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it."

*Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (cleaned up) (applying California law). The "context of the transaction" and "the traditional inquiry related to the visuals involved with the notice, such as font size, text placement, and overall screen design" inform whether a website provides reasonably conspicuous notice of the terms of an agreement. *Id.* at 1019 (cleaned up).

"The second part of the test—whether the user takes some action that unambiguously manifests assent—is relatively straightforward." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023). "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). "[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858.

### B. Whether the Parties Entered into an Agreement to Arbitrate

Two versions of EarnIn's sign-up flow are at issue based on when the plaintiffs created their accounts.

#### 1. Ms. Bunn and Mr. Stow

The sign-up flow that Ms. Bunn and Mr. Stow used to create their accounts in February and October 2022 looked like this:

6



Doc. 19-1 at 2. The first and the last screens, A and B, in larger size were as follows:



*Id*.

Clicking on the "Terms & Privacy Policy" took a user to a screen that included the arbitration agreement. Doc. 19 at ¶¶ 11, 14; *see also* Doc. 22 at 14–17 (plaintiff's brief challenging whether the link provided adequate notice, but not its existence or function).

The first requirement for a valid online agreement is that the consumer was given "reasonably conspicuous notice of the terms." *Chabolla*, 129 F.4th at 1154-55. Here, the hyperlink to the "Terms & Privacy Policy" Terms of Service is in a different blue font immediately above the "next" button and the white screen is uncluttered with dark text

8

throughout. *See* Doc. 19-1 at 2; *see also Oberstein*, 60 F.4th at 516-17 (applying California law and noting that a visible hyperlink to the Terms placed directly above or below the button to click is generally adequate to provide notice); *Keebaugh*, 100 F.4th at 1014. Mr. Stow and Ms. Bunn do not dispute that the screen meets the "notice" requirement of online contract formation. Doc. 22 at 14–19.

The second requirement is that the plaintiffs "unambiguously manifested their assent to those terms." *Chabolla*, 129 F.4th at 1154–55 (cleaned up). "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. "[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858.

Here, the evidence is undisputed that Mr. Stow and Ms. Bunn each clicked on the "Next" button, right below the statement that "By signing up, you agree to the Terms & Privacy Policy," with the "Terms & Privacy Policy" in blue. Doc. 19-1 at 2. They then clicked through the next three screens to get to Screen E, where they clicked on the "create account" button. *Id*.

Courts applying California law have found similar online processes to show assent. For example, in *Oberstein*, the defendant's website provided that "by continuing past this page, you agree to the Terms of Use;" it also included language that by "clicking 'Place Order' you agree to our Terms of Use." 60 F.4th at 515-516. The court found that clicking on these buttons unambiguously manifested assent. *Id*. The court in *Mahram v.*

9

*The Kroger Co.*, held that clicking a "Sign up with email" button unambiguously manifested assent, because the website explained that "By signing up, you agree to our Terms of Service." 324 Cal. Rptr. 3d 575, 577 (Cal. Ct. App. 2024). In both cases, the website told the user what clicking the button meant.

EarnIn used similar language here. EarnIn told users that "By signing up, you agree to the Terms & Privacy Policy." Doc. 19-1 at 2. Clicking the "Next" buttons and then the "Create Account" button constituted assent because each page represented a step in the account creation process and screen A stated that "By signing up, you agree to the Terms & Privacy Policy." *Id.*; *see Berman*, 30 F.4th at 858.

The plaintiffs contend that they did not manifest assent to the Terms of Service agreement because nothing on the page with the "create account" button gave any notice that they were subject to the Terms and Privacy Policy, the link to which was separated from the "create account" screen by several intermediary screens. Doc. 22 at 15–17. They compare the sign-up process to the one in *Chabolla* for which the court found no manifestation of assent. *Id*.

Contrary to the plaintiffs' contentions, the existence of multiple screens alone does not mean that the parties did not manifest assent. *See Chabolla*, 129 F.4th at 1160 (looking to whether "viewed in total a reasonably prudent internet user manifestly assented to the Terms of Use by working her way through the multi-page website" (cleaned up)). *Chabolla's* dispositive fact was that the unclear, operative button on the third screen was labeled "redeem now," which did not make it clear that the user was accepting terms of use provided on an earlier screen. 129 F.4th at 1158–59. Here, the

10

words on the first screen said that by "signing up" a user accepted the terms and conditions, and the words "create account" a few screens later is a reasonably clear synonym for "signing up." Clicking "create account" four screens later manifested assent. Doc. 19-1 at 2.

The language on the screen "explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. Although EarnIn used multiple screens in its sign-up flow like the one in *Chabolla*, EarnIn used clearer language. Doc. 19-1 at 2. The screens in *Chabolla* were filled with advertisements, images, and promotional language about "no commitments," "your offer," and "redeem now." *See Chabolla*, 129 F.4th at 1173–76. EarnIn's 2022 sign-up screens allowed reasonably prudent internet users to know that they were agreeing to the Terms of Service when they followed the sign-up flow and created an account.

By clicking on the "Create Account" button, Mr. Stow and Ms. Bunn unambiguously indicated assent to the Terms of Service. They thus agreed to the arbitration provisions in the Terms of Service when they created their accounts.

### 2. Ms. Lofton

The sign-up flow Ms. Lofton used to create her account in May 2023 looked like this:



# Join over 1 million community members[1]

Almost done! Finish setting up your account with Earnin.

First name

Last name

Phone number

Email address

Create password

**CREATE ACCOUNT**

By continuing, you're agreeing to receive email marketing from Earnin. You're also agreeing to Earnin's Terms of Service and Privacy Policy.

[1] Internal analysis conducted by Earnin in January 2021, represents total users who cashed out at least once from January 1 to December 31, 2020.



12

Doc. 19-2 at 2.

Clicking on the "Terms of Service" took a user to a screen that included the arbitration agreement. Doc. 19 at ¶¶ 15, 17; *see also* Doc. 22 at 9–13 (challenging whether the link provided adequate notice, but not its existence or function).

Ms. Lofton's sign-up page provided reasonably conspicuous notice of the terms of the agreement. The 2023 sign-up flow she used represents a longer image with more information on one screen than the 2022 version. *Contrast* Doc. 19-1 at 2, *with* Doc. 19-2 at 2. The text for the "Terms of Service" is the same color and size as the text surrounding it; however, the text is darker than the white background, underlined, and is immediately below the "create account" button. *See Keebaugh*, 100 F.4th at 1020–21. There are no intermediate screens. The screen itself contains clutter with a footnote and graphic at the bottom, but the screen remains less cluttered than the one at issue in *Chabolla* which had five pictures, more words, and other distracting messages about discounts and cancellation. *Contrast* Doc. 19-2 at 2, *with Chabolla*, 129 F.4th at 1174.

Ms. Loften contends that the notice may not have been visible without scrolling down the webpage, but other courts have upheld agreements where the terms were linked below the button. *See e.g., Oberstein*, 60 F.4th at 516 (holding notice was conspicuous where the hyperlink on some of the pages was below the action button).

Ms. Lofton's click on the "create account" button constituted assent to the Terms of Service agreement. The sign-up screen she used stated that "By continuing, you're agreeing to receive email marketing from Earnin. You're also agreeing to Earnin's Terms of Service and Privacy Policy." Doc. 19-2 at 2. This text was displayed immediately

below the "create account" button, and thus, she manifested assent to be bound by the terms when she created the account. *See Berman*, 30 F.4th at 858.

In the alternative, Ms. Lofton asserts that the arbitration clause in the April 2023 Terms of Service should be invalidated as unconscionable. Doc. 22 at 22. She contends that the unconscionability arises from the prohibition of "Collective Arbitration," which prevents attorneys from representing more than one claimant with similar claims simultaneously. *Id*.; Doc. 18-2 at 27. Under California law, "procedural and substantive unconscionability must both be present in order for a court to refuse to enforce a contract or clause under the doctrine of unconscionability." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6. P.3d 669, 690 (Cal. 2000) (cleaned up). "The threshold inquiry in California's unconscionability analysis is whether the arbitration agreement is adhesive." *Mohamed v. Uber Tech., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016) (cleaned up). And "an arbitration agreement is not adhesive if there is an opportunity to opt out of it." *Id*. Because the April 2023 Terms of Service provided 30 days to opt-out of the arbitration clause without penalty, Doc. 18-2 at 25, it is not unconscionable. *Mohamed*, 848 F.3d at 1211.

Ms. Lofton formed an online agreement, the Terms of Service, with EarnIn when she created her account. The agreement allowed her to opt-out of the arbitration provision, so it was not adhesive nor unconscionable.

V. **CONCLUSION**

All three plaintiffs entered into valid online agreements, the Terms of Service agreements, with EarnIn when they created their accounts. The Terms of Service

14

agreements include arbitration provisions. The Court grants EarnIn's motion to compel arbitration.

As requested by the defendant, Doc. 16 at 1, the case will be stayed. *Smith v. Spizzirri*, 601 U.S. 472, 475–76 (2024). One year is well adequate to allow for arbitration. Consistent with the court's inherent authority to manage its docket and minimize administrative burdens caused by unnecessary ongoing stays, *Smith,* 601 U.S. at 678, the case will be dismissed without prejudice at that time in the absence of a motion by any party requesting other action.

It is **ORDERED** that:

1. The defendant's motion to compel arbitration, Doc. 16, is **GRANTED**.
2. This case is **STAYED** for one year, subject to further order should any party move to lift the stay earlier. Absent a motion to continue the stay filed no later than September 30, 2026, the stay will be lifted and the case dismissed without prejudice on or soon after October 30, 2026, without further notice.

This the 22nd day of October, 2025.

_____
UNITED STATES DISTRICT JUDGE